**SOUTHERN LLOYDS, Appellant,**

v.

**Tom JONES, Appellee.**

No. 10962.

Court of Civil Appeals of Texas.

Austin.

May 2, 1962.

Park Street, Walker Powell Gray, San Antonio, for appellant.

Victor B. Rogers, Byron Fullerton, Austin, for appellee.

HUGHES, Justice.

Tom Jones sued his insurer, Southern Lloyds, to recover on a fire insurance policy issued by it to him effective February 6, 1959, and in force on August 9, 1959, when the insured dwelling was totally destroyed by fire.[1]

Trial to a jury resulted in verdict and judgment for appellee on the policy.

Appellee purchased the lot on which the insured house was situated in February, 1950, by warranty deed duly recorded. The lot is in Manor, Travis County.

Appellee testified that he sold this property to Mr. and Mrs. DeWitty in 1953, and that he went to the law office of Mr. Virgil Lott, an attorney, to sign papers in connection with its sale. Just what those papers were, he did not know.

Mr. Lott testified, and, recalling the transaction, stated that appellee and Mr. and Mrs. DeWitty came to his office in 1953, that he prepared a warranty deed, vendor's lien retained, and a vendor's lien note. Copies of the deed and note were in Mr. Lotts' files and were introduced in evidence. They reflect a conveyance by appellee to the DeWittys for $300.00 cash and a vendor's lien note for $1200.00, payable $300.00 annually for four succeeding years.

1. This is the second appeal of this case. See Southern Lloyds v. Jones, Tex.Civ.App., 345 S.W.2d 435.

Mr. Lott testified that these instruments were signed by the proper parties in his office. He did not know whether or not delivery was made of any of the instruments to the parties entitled to them.

The deed, so executed, was never filed for record in Travis County. The DeWittys never paid any ad valorem taxes on the property. They were fully paid at the time of the 1953 deed. Thereafter no one paid the taxes.

The jury found that appellee did not execute and deliver a deed to the property to the DeWittys in 1953. It did find that appellee entered into a contract of sale with the DeWittys in 1953 to sell them this property, but it found that "such contract of sale, * * * or some revision thereof" was *not* in effect on February 6, 1959, when the insurance policy became effective.

Under the view we take of the case, it is not necessary to determine the existence of evidence to sustain the finding that the 1953 deed was not delivered.

Appellee testified positively that he was the sole owner of this property on the date the insurance was purchased and on the date of the fire. He testified, not always consistently, that because the DeWittys had not made the payments on the place as agreed that he had taken the property back in 1957. Mrs. DeWitty and her fourteen year old son occupied the place when it burned, although Mrs. DeWitty on this particular day was off picking cotton. Mrs. DeWitty and her husband were divorced in 1957. The reason appellee gave for not resuming possession of the property was that the DeWittys would not leave and he "wasn't able to go into a lawsuit to force them, but they had done lost it in 1957."

We quote from the testimony of appellee:

"A Let me see; I can't exactly remember the date, but anyhow I traded with them to pay $300 a year for five years, and when they didn't—they refused to pay me, well, I told them that I had to have the place or the money, and so they couldn't raise it, and I told them I couldn't put them out unless they would get out.

* * * * * *

"Q When did you cancel this agreement that you had,—what year?

"A The third year after I sold it to them.

* * * * * *

"Q All right. Now, then, when was it that you terminated it?

"A It was to be paid out in '57.

"Q Did they pay it out by 1957?

"A No, sir.

"Q So that you took the place back?

"A Yes, sir.

"Q And it has been yours ever since then?

"A Yes, sir."

On cross examination he testified:

"Q And you say you took the property back in 1957, Tom?

"A Yes, sir.

* * * * * *

"Q Did you ever tell the DeWittys that you wanted the property back, and for them to get out?

"A I told them they had done lost it, the five years was up. But I couldn't make them get out. I wasn't able to go into a lawsuit to force them, but they done lost it in 1957. They had five years to pay for it.

"Q Well, now, did you ever tell them that if they would pay you as much as $10.00 a month that they could stay there?

"A I told them; I told them $15.00 a month.

"Q  I see.  Well, when did you tell them that?

"A   I told them that before the fire a while, and she wouldn't move, and she wouldn't even pay that."

Appellee also testified that when he sold the property to the DeWittys it was understood that he "was to keep up the insurance, until they paid me the last dollar."

Appellant has five points, briefed jointly, all to the effect that appellee was not the "unqualified owner" of the insured property, and that there was such a change in ownership of the property as to void the insurance.

Appellant states that its points present the single question of "Whether or not Tom Jones, under the evidence was, at the material times, the *unconditional owner* of the premises such as to warrant a finding sufficient to justify that he had a valid policy of insurance."  Italics added.

We set out in full all the provisions and recitations in the policy or proof of loss upon which appellant relies, as taken from its brief:

"The proof of loss submitted to Appellant upon which the check was issued, signed by Tom Jones, recites 'No exception' as to Item 2, being:

" 'Title and Interest: The property described in the said policy on which loss is claimed belonged at the time of the loss to the assured in fee simple, and no other person or persons had any interest, lien or encumbrance thereon except:'

"The policy itself provides under 'Basic Conditions' lines 1 through 7:

" 'This entire policy shall be void if whether before or after a loss, the insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance, or the subject thereof, or the interest of the assured therein, or in case of any fraud or false swearing by the insured relating thereto.'

"Lines 31 through 47, set out conditions suspending or restricting insurance as follows:

" 'Unless otherwise provided in writing added hereto, this Company shall not be liable for loss occurring (a, b, and c applicable only to Coverage F—Fire):

" 'a) While the hazard is increased by any means within the knowledge and control of the insured, provided such increase in hazard is not usual and incidental to the occupancy as hereon described: or

" 'b) (omitted)

" 'c) (omitted)

" 'd) Following a change in ownership of the insured property: or

" 'e) While any other stipulation or condition of this policy is being violated.'

"Lines 48 through 53, set out the conditions of changes or additions.

" 'Changes in this policy may be made and Perils added hereon only by written endorsement properly executed by an authorized agent of this Company and attached hereto; but no provision may be waived except such as by the terms of this policy is subject to change.' "

We have carefully read the policy of insurance issued to appellee.  In it he is not described as and there is no provision to the effect that he is or should be the "unqualified" or "unconditional" owner of the insured property.  In fact, the policy does not describe him as the owner of the property, but refers to him only as the insured.

We do not mean to say that a valid policy of fire insurance could be issued on property in which the insured has no interest.  The point we make is that appellee did not represent when he obtained the insurance, and the policy did not require that appellee be the "unqualified", "unconditional" or 'fee simple" owner of the insured property.

The proof of loss signed by appellee was a printed form supplied by appellant and the portion of it quoted herein is printed. The alleged falsity of the representation in this statement that the property "belonged at the time of loss to the assured in fee simple" coupled with the policy provision that if, after the loss, the insured has willfully concealed or misrepresented any material fact concerning the interest of the assured in the insured property is relied upon by appellant to void the policy.

There is no evidence that appellee has willfully concealed or misrepresented any fact.

There is also no evidence that there has been any change in the ownership of the insured property since the inception of its insured status with appellant.

We are of the opinion that under the evidence and the jury finding that appellee had an insurable interest in the property at the time of its loss and when the insurance was effected. It is also our opinion that such interest is a fee simple title in the subject property. This conclusion is based upon the decision of the Circuit Court of Appeals, 5th Circuit, in Dean v. Pioneer Co-Operative Fire Insurance Company, 231 F.2d 18, opinion by Brown, Circuit Judge. The Court there considered a Texas Standard Fire Policy, apparently identical with the present policy, and particularly construed the provision, quoted above, providing that a policy should be void following "change in ownership of the insured property." The Court there held that a rescission of a sale of land by a vendor retaining a vendor's lien to secure the unpaid purchase money did not result in a violation of the "change of ownership" provision in the fire insurance policy.

There are two factual differences between that case and this case: (a) There the insured made full disclosure of the sale of the property and the buyer's default to the company before the policy was issued to him. (b) The actual rescission of the sale did not occur until after the policy of insurance was issued.

Here there was no disclosure made by the insured of the sale or rescission, and the rescission occurred before the policy of insurance was issued.

■ The Court in Dean, citing Texas authorities, held that the effect of a rescission by a vendor retaining a vendor's lien is to reinvest the vendor with the title and right to possession as completely as though the sale had never been made. The Court also stated the Texas rule that while default, itself, by the vendee does not amount to an automatic rescission it, rescission, can be accomplished without formal reconveyance by one of many ways effectively reflecting the assertion of that right by the vendor.

■ We construe the jury finding that the "contract of sale * * * was not in effect" when the insurance policy was purchased as being tantamount to a finding that the sale had been rescinded by appellee. The evidence sufficiently supports this conclusion. Appellee testified that the purchaser was in default and that he had taken the property back. He explained his failure to take possession of the house. The purchaser did not pay taxes on the property or insure it. Appellee insured it and represented that it was occupied by a tenant. This was an act and representation consistent with ownership.

■ As to nondisclosure by appellee of the sale and rescission, he was not asked to explain his ownership of the property. He made no false representation concerning it. As far as this insurance is concerned, we cannot understand the materiality of appellee's chain of title to this property or the source from which it came. If appellant desired this information, it should have requested it.

■ If the superior title of a vendor who retains a vendor's lien which is in default,

is insurable as an owner under a Texas Standard Fire Policy and if an actual rescission of the vendor after issuance of the policy and before the loss does not violate the change of ownership provision of such policy, as held in Dean, then the validity of a fire insurance policy purchased by the vendor following default of the vendee and acts by the vendor from which rescission is reflected, would seem to be free from doubt. We so hold, and affirm the judgment of the Trial Court.

Affirmed.